1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    MICHAEL ROMERO,                          Case No.  12-cv-01084-WHO

                    Plaintiff,
8                                             **ORDER DENYING MOTION FOR**
            v.                                **SUMMARY JUDGMENT**
9
                                              Re: Dkt. No. 83
     S. S. ELLERY, et al.,
10
                    Defendants.
11

12                                **INTRODUCTION**

13          Plaintiff Michael Romero alleges Pelican Bay State Prison correctional officers S. Ellery

14   and P. Harman used excessive force against him in violation of 42 U.S.C. § 1983.  The

15   defendants[1] move for summary judgment, arguing that on this record there is no Eighth

16   Amendment violation and that the officers are also protected by qualified immunity.  Defendants

17   present strong arguments that, at a minimum, qualified immunity should apply.  However, a

18   genuine dispute of material fact exists, created by the difference in testimony between Romero and

19   the defendants about the incident.  Crediting Romero's version of events, Ellery's multiple blasts

20   of pepper spray without warning constituted excessive force that caused unnecessary and wanton

21   pain and suffering under clearly established law.  As a result, defendants' motion for summary

22   judgment is DENIED.

23                                **BACKGROUND**

24          On April 23, 2011, Romero was an inmate at Pelican Bay State Prison in the Security

25   Housing Unit ("SHU").  First Amended Complaint ("FAC") at p. 3-4 [Dkt. No. 7]; Romero Depo.

26

27   _____

28   [1] Although the motion was brought on behalf of Ellery, Harman, and Grenert, Grenert was
     previously dismissed with prejudice from the action.  Dkt. No. 90.  Therefore, this Order focuses
     only on the remaining two defendants, Harman and Ellery.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    at 18:6-8 [Dkt Nos. 84-1, 93-6].  The SHU is organized into at least two "sides," a C-side and a D-

2    side, and each side is divided into multiple pods.  Harman Depo. at 64:3-8 [Dkt. Nos. 84-3, 93-9].

3    A pod is a single corridor of cells, with an upper and lower tier.  *Id*. at 30:25-31:5.

4         "Pod raids," or searches of numerous cells, are performed periodically in the SHU.  Ellery

5    Depo. at 106:20-107:20 [Dkt. Nos. 84-2, 94-7].  Generally, during a pod raid, multiple officers

6    enter the pod and shout variations of "lights on," "cuff up," and "shirt, shorts and shower shoes."

7    Harman Depo. at 68:21-69:7; Ellery Depo. at 93:9-96:4.  Officers typically expect an inmate to

8    respond by turning the cell's light to "bright" (the light can be off, dim, or bright and is controlled

9    by a switch in the cell) and presenting himself in his shorts, t-shirt, and shower shoes in front of

10   the cuff port.  Harman Depo. at 48:9-23, 62:12-63:16; Ellery Depo. at 95:6-25.  The inmate is then

11   expected to remove his clothing and pass it through the cuff port so that the officers can search it,

12   after which the inmate puts the clothing back on and submits his wrists in order to be "cuffed up."

13   Ellery Depo. at 95:15-21.  The cell door is only opened after the occupants are cuffed.  *Id*. at 93:9-

14   96:4.

15        At approximately 6:15 p.m. on April 23, 2011, correctional officers Ellery and Harman

16   participated in a pod raid of two of the SHU pods.  *Id*. at 36:10-24; Harman Depo. at 63:17-25.

17   The SHU houses inmates who have been "validated" as gang member by the California

18   Department of Corrections and Rehabilitation or have a history of violence.  Pickett Depo. at

19   66:21-68:19 [Dkt. No. 93-13]; Ellery Depo. at 86:14-87:8.  The D4 unit, where Romero was

20   located, houses the validated gang members.  Harman Depo. at 99:20-24.  Ellery and Harman

21   were not regularly assigned to the pod.  Ellery Depo. at 88:11; Harman Depo. at 64:4-8.

22        As Ellery and Harman approached Romero's cell, they ordered him to turn on his cell

23   lights, to submit to a search, and to cuff up.  Ellery Depo. at 106:8-107:24.  Other officers were

24   yelling similar orders for the other inmates.  Jones Depo. at 26:11-27:25 [Dkt. No. 93-10].  This

25   procedure is standard for any cell search or pod raid and Romero was familiar with it.  Romero

26   Depo. at 95:19-97:10.  At the time the pod raid started, Romero was taking a "bird bath" in his cell

27   sink.  *Id*. at 27:12-19; 28:20-31:8.  When Ellery arrived at Romero's cell, Ellery opened the cuff

28   port so that Romero could submit to cuffing.  Ellery Depo. at 110:7-20.

Romero's light, which had been on, went to off at some point around the time the officers approached the cell. *Id*. at 104:14-105:2; Romero Depo. at 32:3-12, 39:14-41:17. According to Romero, he had the light on dim and it malfunctioned to off when he tried to turn it to bright. Romero Depo. at 32:3-12, 40:17-41:7-17. He testified that when a switch is wet, it sometimes malfunctions by going to off and not to bright. *Id*. at 41:7-17. Exactly when the light was turned off is unclear. Romero does not remember if the light was still on when the officers were at his cell door. *Id*. at 54:10-55:14. Harman and Ellery testified that the light was on when they arrived and, after Romero was instructed to turn the bright light on, he turned the light off. Harman Depo. at 70:24-71:4; Ellery Depo. at 104:3-105:2.

After the light malfunctioned, Romero says that he attempted to dry off and retrieve his t-shirt and shower shoes from his locker located in the back of his cell. Romero Depo. at 49:14-22, 58:17-20. Defendants observed him rummaging around in the back of his cell. Ellery Depo. at 108:16-109:2, 116:4-12; Harman Depo. at 108:16-109:2. Defendants testified that upon observing these actions, they were immediately concerned because they had never experienced an inmate turn the light off during a pod raid. Ellery Depo. at 108:2-15; Harman Depo. at 70:17-23. The officers were especially concerned that Romero was going to "gas" or spear them. [2] Harman Depo. at 83:15-25. Ellery and Harman testified they shouted repeated commands to Romero, including instructing him to let them see his hands, to stop what he was doing, and to turn the light on. Ellery Depo. at 109:4-17, 113:6-5; Harman Depo. at 73:4-7.

Romero does not recall hearing orders that were specifically directed at him. Romero Depo. at 71:13-18. But Romero does remember one of the officers say something along the lines of "can I spray him?" *Id*. at 69:11-72:24. He recalls another officer say "yes" and then feeling the first blast of oleoresin capsicum ("O.C.") spray. *Id*. at 83:8-17. He testified that he did not recall receiving any warning that his behavior was going to lead to being pepper sprayed. *Id*. at 101:22-103:2, 105:24-106:11. At the time of the first blast, he was squatting in the lower right portion of

---

[2] "Gassing" occurs when an inmate mixes bodily fluids and waste, such as feces, urine, and saliva, and throws it onto another person. Ellery Depo. at 40:22-44:9. Spearing occurs when an inmate throws or stabs someone with a manufactured spear or weapon. *Id*. at 43:9-13.

United States District Court
Northern District of California

United States District Court
Northern District of California

his cell with his left side facing the cell door.  *Id.* at 84:11-22.  After being sprayed the first time, Romero testified he repeatedly told the guards that he was "not doing anything."  *Id.* at 102:23-24; 105:20.  The officers testified that Romero made "no response" and "completely ignored" them. Ellery Depo. at 115:12-17.

After repeating orders to cuff up and receiving no response, Ellery dispensed another burst of O.C. spray.  Ellery Depo. at 115:21-116:12.  Romero has no recollection of the time between the blasts because it all happened so quickly.  Romero Depo. at 101:22-102:8.  Ellery recalls a delay between five to ten seconds, Ellery Depo. at 115:24-116:3, whereas Harman testified that he did not recall exactly but it "could have been around 30 seconds or so,"  Harman Depo. at 81:3-9. After the second spray, Ellery testified that Romero continued to "totally ignore[]" them and did not comply with their verbal orders.  Ellery Depo. at 116:13-20.  Romero stated that at this time he was blinded and trying to feel his way to the door.  Romero Depo. at 99:1-101:21.  He repeatedly tried to tell the officers that he was "not doing nothing."  *Id.* at 102:22-23; 105:19-20.

Romero was sprayed a third time.  Ellery Depo. at 118:21-23.  None of the blasts hit him straight on; most hit his side.  Romero Depo. at 127:24-128:8.  After the third blast, Romero reached the front of the cell and was handcuffed.  Ellery Depo. at 118:24-119:4.  According to Ellery, the whole incident lasted less than a minute.  *Id.* at 114:23-25.

The duration of the blasts is in dispute.  Defendant Harman testified that each burst of pepper spray lasted approximately two seconds.  Harman Depo. at 130:4-13.  Romero stated that each blast lasted approximately five to ten seconds.  Romero Depo. at 89:8-21, 92:16-20, 93:25-94:1.

As a result of the incident, Romero felt as though his body was "on fire" and he was "drowning" in his own saliva.  *Id.* at 126:24-127:4.  After the three rounds of spray, he had to get extra boxers because the ones he had on were "soaked."  *Id.* at 127:19-23.  At some point after the incident, he was escorted out of his cell to the shower in the pod.  *Id.* at 136:2-11.  He stood under the shower for a "few minutes" until he told the officer he was finished.  *Id.* at 136:20–137:10. The shower cooled down the burning sensation he was feeling but he was still coughing and choking and his vision was blurry.  *Id.* at 137:13-17.  After his shower, Romero was placed in a

United States District Court
Northern District of California

1   holding cell until a nurse came to see him. *Id*. at 138:5-10. When he returned to his cell, it was

2   not fully decontaminated and so he spent most of the night cleaning it. *Id*. at 148:13-149:11. He

3   was prescribed artificial tears and Aller-chlor, an antihistamine, to treat the effects of the pepper

4   spray. *Id*. at 158:3-11. It took approximately six days for the burning to subside and Romero had

5   difficulty sleeping for at least ten days afterward. *Id*. at 149:12-17; 150:12-13. To this day he still

6   worries about being sprayed again and feels like he has to be "on guard" every time his cell door

7   opens. *Id*. at 158:12-159:18.

**LEGAL STANDARD**

9          A party is entitled to summary judgment where it "shows that there is no genuine dispute

10   as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A

11   dispute is genuine if it could reasonably be resolved in favor of the nonmoving party. *Anderson v.*

12   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material where it could affect the

13   outcome of the case. *Id*.

14          The moving party has the initial burden of informing the court of the basis for its motion

15   and identifying those portions of the record that demonstrate the absence of a genuine dispute of

16   material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Once the movant has

17   made this showing, the burden shifts to the nonmoving party to identify specific evidence showing

18   that a material factual issue remains for trial. *Id*. The nonmoving party may not rest on mere

19   allegations or denials from its pleadings, but must "cit[e] to particular parts of materials in the

20   record" demonstrating the presence of a material factual dispute. Fed. R. Civ. P. 56(c)(1)(A). The

21   nonmoving party need not show that the issue will be conclusively resolved in its favor. *See*

22   *Anderson*, 477 U.S. at 248-49. All that is required is the identification of sufficient evidence to

23   create a genuine dispute of material fact, thereby "requir[ing] a jury or judge to resolve the parties'

24   differing versions of the truth at trial." *Id*. (internal quotation marks omitted). If the nonmoving

25   party cannot produce such evidence, the movant "is entitled to...judgment as a matter of law

26   because the nonmoving party has failed to make a sufficient showing on an essential element of

27   her case." *Celotex*, 477 U.S. at 323.

28

1    On summary judgment, the court draws all reasonable factual inferences in favor of the

2    nonmoving party. *Anderson*, 477 U.S. at 255.  "Credibility determinations, the weighing of the

3    evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a

4    judge." *Id.*  However, conclusory and speculative testimony does not raise a genuine dispute and

5    is insufficient to defeat summary judgment.  *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594

6    F.2d 730, 738-39 (9th Cir. 1979).

7                                          **DISCUSSION**

8    **I.    EXCESSIVE FORCE VIOLATION**

9         The treatment a prisoner receives in prison is subject to scrutiny under the Eighth

10   Amendment. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  A prison official violates the Eighth

11   Amendment when: (1) "the deprivation alleged [is] sufficiently serious;" and (2) the prison official

12   possesses a "sufficiently culpable state of mind." *Id.* at 834.  The state of mind required for an

13   excessive force claim is fulfilled if a prison official applies force "maliciously and sadistically" so

14   as to cause harm. *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).  Five *Hudson* factors are

15   generally considered in determining whether a violation occurred: "(1) the extent of injury

16   suffered by an inmate; (2) the need for application of force; (3) the relationship between that need

17   and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and

18   (5) any efforts made to temper the severity of a forceful response." *Martinez v. Stanford*, 323 F.3d

19   1178, 1184 (9th Cir. 2003) (citing *Hudson*, 503 U.S. at 7).

20        **A.    Extent of Injury**

21        "[T]he extent of injury suffered by an inmate is one factor that may suggest whether the

22   use of force could plausibly have been thought necessary in a particular situation, or instead

23   evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a

24   knowing willingness that it occur." *Hudson*, 503 U.S. at 7 (internal quotation marks omitted).

25        Following the incident, Romero experienced considerable physical and psychological

26   effects.  After the first blast of O.C. spray, Romero began coughing and feeling as though he was

27   blinded and could not breathe.  Romero Depo. at 100:5-11.  He closed his eyes after being pepper

28   sprayed the first time, but he continued to cough and choke during the following two blasts.  *Id.* at

United States District Court
Northern District of California

United States District Court
Northern District of California

101:6-16.  As a result of the three blasts of O.C. spray, Romero was sprayed "all over" his face and body.  *Id*. at 103:10-13; 127:19-23.  Everything he had on was "soaked."  *Id*. at 127:23.

After he submitted to being handcuffed, he was required to wait in his cell for what seemed like a "long time."  *Id*. at 126:6-7.  He felt like his body was "basically on fire."  *Id*. at 127:15.  He was worried he was going to "drown in [his] saliva and mucus" so, while he waited, he tried to lean over the toilet and blow out his nose while his hands were still in handcuffs.  *Id*. at 125:1-126:15.  He was allowed to shower after the incident.  Following the shower, he was returned to his cell where he used a washcloth to clean it because it was not decontaminated following the incident.  *Id*. at 148:13-149:11.  He did not get "any kind of sleep" for approximately ten days following the incident because his body was so swollen and burned that any time he tried to lay down, the contact with his skin would wake him up immediately.  *Id*. at 149:12-25.  Although he gave himself a "birdbath" every day, it took at about six days for the burning in his eyes to stop. *Id*. at 150:12-13.  He was given medicine by the medical staff to ease his symptoms, but the pain did not go away for about twenty days.  *Id*. at 150:19-22.  He reported to medical staff that he felt "queasy, headaches, [and] loss of appetite."  *Id*. at 155:12-21.  The incident left him with lasting nervousness every time his cell door opens and he is "constantly worried" about whether it will happen again.  *Id*. at 158:12-159:18.

While Romero sustained no severe or permanent physical damage, the incident caused him at least moderate injuries.  *See Furnace v. Sullivan*, 705 F.3d 1021, 1029 (9th Cir. 2013) (characterizing burns, blisters, and skin irritation that persisted for three or four days after being pepper sprayed as moderate injuries); *Williams v. Young*, No. 2:12-cv-0318, 2015 WL 4617985, at *12 (E.D. Cal. July 31, 2015) ("The extent of injury allegedly suffered by plaintiff was moderate; in addition to suffering pain and burning in his eyes, plaintiff claims the effects lasted for about a week, and that he had to deal with a period of dizziness and had real bad blurriness.") (internal quotation marks omitted).

### B.      Need for Force and Amount of Force Used

"Whether the prison disturbance is a riot or a lesser disruption, corrections officers must balance the need to maintain or restore discipline through force against the risk of injury to

inmates." *Hudson*, 503 U.S. at 6 (internal quotation marks omitted).  "Not every instance of inmate resistance justifies the use of force, and use of pepper spray will not be justified every time an inmate questions orders or seeks redress for an officers actions." *Treats v. Morgan*, 308 F.3d 868, 872-73 (8th Cir. 2002) (internal citation omitted).

Ellery and Harman responded to Romero's non-complaint behavior by pepper spraying him three times.  As discussed above, the length of each blast of pepper spray is contested. Romero testified each blast lasted between five and ten seconds, whereas Harman testified that each blast lasted approximately two seconds.  Romero Depo. at 89:14-16; Harman Depo. at 130:4-13.  The time between each blast is unclear.  Romero testified "everything happened so fast" that he could not recall the time between the blasts.  Romero Depo. at 101:22-102:8.  Ellery's recollection is that five to ten seconds elapsed between the first and second blast.  Ellery Depo. at 115:24-116:3.

According to the Department of Corrections and Rehabilitation's Department Operations Manual in place at the time of the incident, when immediate force is necessary for inmates confined in their cells, O.C. spray is the preferred option for carrying out the immediate use of force.  AGO00860.  Defendants argue Ellery's use of the O.C. spray was "necessary to squelch Romero's actions and restore order and security."  Mot. at 11 [Dkt. No. 83]. However, the manual specifically instructs that "a verbal warning shall be given before force is used unless the circumstances require immediate force that precludes a verbal warning."  *Id*.  In this case, Romero testified that at no time was he given a warning that O.C. spray would be used against him, Romero Depo. at 101:22-103:2, and Ellery does not recall giving one, Ellery Depo. at 114:14-18. The officers testified that they repeatedly commanded Romero to cuff up, but Romero does not recall hearing them.  Romero Depo. at 101:6-102:8.  Despite his efforts to "find a bunk or a wall in order to get [himself] to the door" following the first blast of O.C. spray, he was pepper sprayed twice more.  *Id*. at 101: 13-21.

Taking all factual inferences in Romero's favor, as I must, three blasts of O.C. spray, each lasting between five and ten seconds, is not a *de minimis* amount of force.  Ellery saw that the first blast had hit Romero in the head.  Ellery Depo. at 115:4-17.  A reasonable officer would know that

8

United States District Court
Northern District of California

spraying someone with O.C. spray in the face or head area can be disorienting and lead to impaired vision. Even if the first blast was justified, which is not clear on this record, considering that the second and third blasts came in quick succession with no warning, a reasonable jury could find that this conduct constituted a significant use of force. A triable issues exist whether defendants should have allowed Romero more time to comply with their commands and provided a clear warning that (further) force would be used.

### C.   Perceived Threat

A court must take into account "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them." *Whitley v. Albers*, 475 U.S. 312, 321 (1986). In this case, a triable dispute of material fact exists as to whether the perceived threat warranted the force imposed.

Instead of encountering the cell light on and Romero ready to be handcuffed, as per pod raid instructions, the officers observed Romero's cell light going off and Romero rummaging in the back of his cell. Ellery Depo. at 108:16-109:2. The officers repeated their verbal orders but Romero remained at the back of his cell. At the time force was used, Romero was approximately six feet away from the officers and the cuff port was open. *Id*. at 110:2-6. It is undisputed that Romero did not have a weapon or gas in his cell, he did not verbalize any threat to the officers, nor did he make any actively aggressive gestures. Nevertheless, given that the cell light was off and Romero was seemingly reaching for something in the back of his cell, a juror could certainly find that the officers' fears of being gassed or speared were reasonable.

Ellery testified that defendants were two of eight officers on the tier at that time, including at least one other officer within arm's reach. *Id*. at 112:3-21. While the presence of other officers does not reduce the chance of being gassed or speared, it is notable that Ellery and Harman were not on their own and could have called on the other officers had the situation escalated. Of course, the officers' perception of the situation is contrasted with Romero's testimony that after he was pepper sprayed he repeatedly tried to tell the officers that he was "not doing nothing." Romero Depo. at 102:23-24; 105:20. Although the defendants testified they did not hear Romero, Ellery indicated that if an inmate offers a reasonable explanation for a delay or inability to comply with

9

1    an order, the use of force such as O.C. spray can be avoided.  Ellery Depo. at 116:15-117:12.

2    **D.      Efforts to Temper the Severity of the Response**

3        This factor does not weigh heavily in favor of either side.  The whole incident happened in

4    less than a minute.  As discussed above, it is undisputed that no warning was given regarding the

5    use of O.C. spray or that failure to comply would result in additional uses of force.  Nor does it

6    appear that the officers attempted to otherwise change their response to the situation by backing

7    away from the perforated cell door to avoid any potential gassing or spearing or by engaging the

8    assistance of the other officers who were present. On the other hand, Ellery stopped pepper

9    spraying Romero once Romero presented himself for handcuffing at the cell door.  Romero was

10   also given access to a shower after the incident in order to ameliorate the effects of the O.C. spray.

11       In sum, applying the *Hudson* factors to Romero's version of the facts, I find there are

12   multiple triable issues of material fact that preclude granting summary judgment in favor of

13   defendants.

14   **II.     QUALIFIED IMMUNITY**

15       Even if a violation is established, qualified immunity shields government officials from

16   civil damages unless their conduct violates "clearly established statutory or constitutional rights of

17   which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

18   The determination of whether the law was clearly established "must be undertaken in light of the

19   specific context of the case."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Courts may "not define

20   clearly established law at a high level of generality."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 742

21   (2011).  Rather, at the time of the challenged conduct, case law must have established the contours

22   of the right alleged to have been violated with sufficient clarity that a "reasonable official would

23   have understood that what he is doing violates that right."  *Id*. at 2083; *see also Alston v. Read*,

24   663 F.3d 1094, 1098 (9th Cir. 2011) ("[T]he right the officials are alleged to have violated must be

25   clearly established in a more particularized, and hence more relevant, sense.") (internal quotation

26   marks omitted).  It is Romero's "burden to show that the contours of the right were clearly

27   established" at the time of the alleged misconduct.  *Clairmont v. Sound Mental Health*, 632 F.3d

28   1091, 1109 (9th Cir. 2011).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    I focus my inquiry on cases decided prior to the date of the incident, April 2011.  As

2  multiple other district courts within this circuit have noted, prior to April 2011, the case law

3  regarding the parameters of the permissible use of O.C. spray to address inmates who disobey or

4  interfere with officers' commands was not well defined.  *See, e.g.*, *Jennings v. Hays*, No. 10-cv-

5  8004, 2011 WL 1480038, at *9 (D. Ariz. Apr. 19, 2011) ("The law is unclear regarding the

6  parameters of the permissible use of pepper spray to address inmates who disobey orders or

7  interfere with officers in the performance of their duties."); *Brown v. Williams*, No. 09-cv-00792,

8  2011 WL 386852, at *5 (E.D. Cal. Feb. 3, 2011), *report and recommendation adopted*, No. 09-cv-

9  00792, 2011 WL 1344564 (E.D. Cal. Apr. 8, 2011) ("There is little Supreme Court and Ninth

10  Circuit published precedent that addresses the use of chemical agents to maintain prison

11  discipline, let alone the use of chemical agents to establish compliance with a lawful

12  order.")(citations omitted); *Howard v. Nunley*, No. 06-cv-00191-NVW, 2010 WL 3785536, at *4

13  (E.D. Cal. Sept. 24, 2010), *aff'd*, 465 F. App'x 669 (9th Cir. 2012) ("Supreme Court and published

14  Ninth Circuit precedent have little to say about the appropriate use of pepper spray or similar

15  agents to enforce prison discipline.").

16    Relevant cases decided prior to the incident demonstrate that the administration of pepper

17  spray to induce a prisoner "to follow directions falls within the wide-ranging zone of deference

18  accorded to prison officials in shaping prophylactic or preventive measures intended to reduce the

19  incidence of breaches of prison discipline."  *Stewart v. Stewart*, 60 Fed. App'x 20, 22 (9th Cir.

20  2003) (unpublished memorandum disposition) (internal quotation marks and modifications

21  omitted); *see also Rodriguez v. Elmore*, 407 F. App'x 124, 125 (9th Cir. 2010) (affirming the

22  district court's grant of summary judgment in favor of the correctional officer when the defendant

23  had administered pepper spray to the plaintiff and his cellmate after they repeatedly refused to

24  comply with orders to exit their cell and be handcuffed) (unpublished memorandum disposition)

25  (unpublished memorandum disposition); *Allen v. Bosley*, 253 F. App'x 658, 659 (9th Cir. 2007)

26  (holding that the plaintiff failed to raise a triable issue that the correctional officers used excessive

27  force when they administered pepper spray to induce another inmate to comply with orders to

28  submit to handcuffing) (unpublished memorandum disposition); *Robinson v. Okamoto*, 26 F.

11

1   App'x 749 (9th Cir. 2002) (affirming the district court's grant of summary judgment to the

2   defendant who sprayed the plaintiff after he refused to comply with the officer's commands)

3   (unpublished memorandum disposition).

4          Defendants argue that because the Ninth Circuit "regularly affirms" decisions where

5   correctional officers use pepper spray to restore discipline, Ellery and Harman are entitled to

6   qualified immunity. Mot. at 19.  But, as Romero notes, in multiple cases that grant summary

7   judgment in favor of defendants, inmates were given a verbal warning that O.C. spray would be

8   used.  *See, e.g.*, *Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979) ("We think the record

9   further indicates, however, that use of the substance in small amounts may be a necessary prison

10  technique if a prisoner refuses after adequate warning to move from a cell or upon other

11  provocation presenting a reasonable possibility that slight force will be required."); *Randle v.*

12  *Miranda*, 315 F. App'x 645, 645 (9th Cir. 2009) (affirming the district court's grant of summary

13  judgment to the defendants when the inmate had been informed that the officer would use pepper

14  spray if he failed to comply with her orders) (unpublished memorandum disposition); *Howard v.*

15  *Nunley*, 465 F. App'x 669, 670 (9th Cir. 2012) (affirming the district court's grant of summary

16  judgment to defendant after the inmate had received a warning not to repeat his offensive behavior

17  and that he would be pepper sprayed if he did) (unpublished memorandum disposition).

18         Here, if one accepts Romero's description of the case, defendants acted contrary to the

19  direction of the Department of Corrections and Rehabilitation's Department Operations Manual in

20  place at the time of the incident because they failed to give a verbal warning.   The Manual

21  instructs that a verbal warning "shall be given" before the use of immediate force unless the

22  circumstances "require immediate force that precludes a verbal warning."  AGO00860.

23  Defendants testified that the darkened cell and Romero's non-compliance with their commands

24  caused them to be concerned for their safety.  But they had time to repeatedly shout instructions

25  during the incident, both prior to the use of the O.C. spray and between blasts.  Romero testified

26  that, prior to the first pepper spray blast, he heard an officer ask the other whether he should use

27  O.C. spray and heard the individual say "yes."  Romero Depo. at 83:8-17.  This testimony, if

28  believed, indicates that the officers had time to deliberate regarding the appropriate use of force.

United States District Court
Northern District of California

1    Taking all factual inferences in favor of Romero, the need for a warning was clearly established at

2    the time of the incident and the circumstances did not preclude defendants from issuing a verbal

3    warning that pepper spray would be used.

4         The need to give a verbal warning prior to the application of immediate force is consistent

5    with clearly established law in the Ninth Circuit at the time.  *See Furnace v. Sullivan*, 705 F.3d

6    1021 (9th Cir. 2013).  In that case, an inmate requested a vegetarian breakfast, was told he was not

7    entitled to one and was given the option to accept a non-vegetarian meal or be marked as refusing

8    it.  705 F.3d at 1025. [3]  He attempted to speak with one of the officers by "squatting down and

9    putting his fingertips on the bottom portion of the open food port" from where he intended to call

10   out to the officer.  *Id*.  "Without warning, [an officer] sprayed Furnace with pepper spray."  *Id*.

11        In considering whether the officers were entitled to qualified immunity, the Ninth Circuit

12   recognized that, as of the time of the decision, "very few of our cases deal with constitutional

13   limits on the use of pepper spray on confined inmates."  *Id*. at 1028.  Although the court went on

14   to reason that the principles previously articulated with respect to tear gas also apply to pepper

15   spray, it acknowledged that officers are not required to have the "legal knowledge culled by the

16   collective hindsight of skilled lawyers and learned judges."  *Id*.  It therefore focused its analysis on

17   whether the use of force caused "unnecessary and wanton pain and suffering, as defined in

18   *Hudson*, since that law was undoubtedly clear."  *Id*.  In concluding that the officers were not

19   shielded by qualified immunity, the Ninth Circuit explained that it was not persuaded that the use

20   of "violent force, prior to a verbal warning, was necessary to gain Furnace's compliance."  *Id*. at

21   1029.  The court focused on the prison's Operations Procedure which directed officers to issue a

22   warning that a chemical agent will be used if an inmate takes control of a food port.  *Id*.  The court

23   declared that, barring urgency or exigent circumstance, the interests protected by qualified

24   immunity are "less compelling when the appropriate response to a situation has been prescribed by

25   the prison's own written policies."  *Id*. at 1030.

26        The combination of the lack of verbal warnings, the multiple blasts of pepper spray and the

27

28   ────────────────────
     [3] Although the Ninth Circuit's decision was issued in 2013, the underlying events occurred in
     2005.  *See Furnace v. Sullivan*, No. 07-cv-4441-MMC, Dkt No. 37 (N.D. Cal. March 31, 3010).

                                        13

difference in testimony between Romero and defendants about what happened during the incident creates a genuine dispute that prevents summary judgment.  On this record, defendants have not established that they are entitled to qualified immunity on Romero's excessive force claim.

<b>CONCLUSION</b>

For the reasons described above, defendants' motion for summary judgment is DENIED.

**IT IS SO ORDERED**.

Dated: August 15, 2016



WILLIAM H. ORRICK
United States District Judge